## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-1211

CORINNE BENNINGTON, a Colorado resident,
and STEPHEN BENNINGTON, a Colorado resident,

Plaintiffs,

v.

STRYKER CORPORATION, a Michigan corporation;
STRYKER SALES CORPORATION, a Michigan
corporation; HOWMEDICA OSTEONICS CORPORATION,
a New Jersey corporation; CORIN GROUP, PLC, a foreign
entity; CORIN USA LIMITED, CO, a foreign entity; DOES 1-20,
inclusive; and DOE ENTITIES 11-20, inclusive,

Defendants.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiffs, Corinne Bennington and Stephen Bennington, by and through their

counsel, **JORDAN HERINGTON & ROWLEY**, for their Civil Complaint against Defendants,

allege and aver as follows:

## INTRODUCTION

1.      This is an action for product liability, sounding in strict liability and

negligence, arising out of a STRYKER/CORIN prosthetic metal-on-metal hip implant

system that was implanted into Plaintiff Corrine Bennington's right hip on or about August

11, 2008.

2.      As a result of the Defendants' defective products, Corinne Bennington

endured significant pain, developed significant medical ailments, and has suffered

1

permanent damages and losses.

3.      In September 2018, Plaintiffs' physicians, for the first time, determined what was causing Ms. Bennington's numerous medical conditions.   At that time, she was diagnosed with metallosis and a failed metal-on-metal hip implant.   Prior to that time, neither Ms. Bennington nor her physicians were aware of what was causing her ongoing medical conditions.

## PARTIES

4.      At all relevant times, Plaintiff **CORRINE BENNINGTON** was and is a resident of the State of Colorado.   Plaintiff Corrine Bennington is, and has at all relevant times been, the wife of Plaintiff Stephen Bennington

5.      At all relevant times, Plaintiff **STEPHEN BENNINGTON** was and is a resident of the State of Colorado.   Stephen Bennington is, and has at all relevant times been, the husband of Plaintiff Corrine Bennington.

6.      At all relevant times, Defendant **STRYKER CORPORATION** was and is a corporation organized and existing under the laws of the State of Michigan with its principle place of business in Kalamazoo, Michigan.   Defendant Stryker Corporation does business in the State of Colorado, is a resident of the State of Colorado for purposes of personal jurisdiction, and is subject to the jurisdiction and venue of this Court.   Stryker Corporation is authorized to do business and is doing business in the State of Colorado and maintains a registered agent for service in Colorado: CT Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112-1268.

7.      At all relevant times, Defendant **STRYKER SALES CORPORATION** was and is a corporation organized and existing under the laws of the State of Michigan with

its principle place of business in Kalamazoo, Michigan.  Defendant Stryker Sales Corporation does business in the State of Colorado, is a resident of the State of Colorado for purposes of personal jurisdiction, and is subject to the jurisdiction and venue of this Court.  Upon information and belief, Stryker Sales Corporation is a wholly owned subsidiary of Defendant Stryker Corporation.  Stryker Sales Corporation is authorized to do business and is doing business in the State of Colorado and maintains a registered agent for service in Colorado: CT Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112-1268.

8.     At all relevant times, Defendant **HOWMEDICA OSTEONICS CORPORATION** was and is a corporation organized and existing under the laws of the State of New Jersey with its principle place of business in Mahwah, New Jersey.  Upon information and belief, Howmedica Osteonics Corporation is a wholly owned subsidiary of Defendant Stryker Corporation.  Defendant Howmedica Osteonics Corporation does business in the State of Colorado, is a resident of the State of Colorado for purposes of personal jurisdiction, and is subject to the jurisdiction and venue of this Court.  Howmedica Osteonics Corporation is authorized to do business and is doing business in the State of Colorado and maintains a registered agent for service in Colorado: CT Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112-1268.

9.     Defendants **STRYKER CORPORATION, STRYKER SALES CORPORATION, HOWMEDICA OSTEONICS CORPORATION, JOHN DOE NOS. 1-10**, and **JOHN DOE ENTITIES NOS. 1-10** are hereinafter collectively referred to as "STRYKER."

10.     Upon information and belief, some or all of the Stryker Defendants are wholly owned and/or significantly owned subsidiaries of other Stryker Defendant manufacturers, thereby further qualifying as a "manufacturer" pursuant to C.R.S. 13-21-401(1), which includes "any seller of a product who is owned in whole or significant part by the manufacturer."

11.     STRYKER designed, engineered, developed, tested or failed to test, approved, manufactured, fabricated, assembled, equipped, inspected or failed to inspect, labeled, advertised, promoted, marketed, distributed, wholesaled, supplied, and sold medical implant devices including the hip implant system and its components that were implanted into Plaintiff Corrine Bennington in November 2008 (hereinafter the "Subject Hip Implant System").

12.     At all relevant times, Defendant **CORIN GROUP PLC** was and is a corporation organized and existing under the laws of the United Kingdom.  Corin Group PLC does business in the United States and in the State of Colorado, is a resident of the State of Colorado for purposes of personal jurisdiction, and is subject to the jurisdiction and venue of this Court.  Corin Group PLC may be served through the Hague Convention at: The Senior Master, For the attention of the Foreign Process Section, Room E16, Royal Courts of Justice, Strand, London WC2A 2LL.

13.     At all relevant times, Defendant **CORIN USA LIMITED, CO**. was and is a corporation believed to be organized and existing under the laws of the United Kingdom with is principle United States office located in the State of Florida.  Corin USA Limited, Co. does business in the State of Colorado, is a resident of the State of Colorado for purposes of personal jurisdiction, and is subject to the jurisdiction and venue of this Court.

4

Upon information and belief, Corin USA Limited, Co. was formerly known as Corin USA Limited, Inc.  Corin USA Limited, Co. may be served through is registered agent: Jesse Ferguson, 12750 Citrus Park Lane, Suite 120, Tampa, Florida 33625.

14.     Defendants **CORIN GROUP PLC, CORIN USA LIMITED, CO., JOHN DOE NOS. 11-20**, and **JOHN DOE ENTITIES 11-20** will hereinafter collectively be referred to as "CORIN."

15.     Upon information and belief, some or all of the Corin Defendants are wholly owned and/or significantly owned subsidiaries of other Corin Defendant manufacturers, thereby further qualifying as a "manufacturer" pursuant to C.R.S. § 13-21-401(1), which includes "any seller of a product who is owned in whole or significant part by the manufacturer."

16.     CORIN designed, engineered, developed, tested or failed to test, approved, manufactured, fabricated, assembled, equipped, inspected or failed to inspect, labeled, advertised, promoted, marketed, distributed, wholesaled, supplied, and sold medical implant devices including the Corin Cormet Cup that was part of the Subject Hip Implant System that was implanted into Plaintiff Corrine Bennington in November 2008 (hereinafter the "Subject Cormet Cup").

17.     At all relevant times, Defendants **JOHN DOE NOS. 1-20** and **JOHN DOE ENTITIES NOS. 1-20** are that person, corporation or other legal entity who or which designed, manufactured, supplied, labeled, marketed, and/or sold the component parts for the manufacturer of the Subject Hip Implant System and/or whose negligence was a cause of Plaintiffs' injuries and damages. Defendants John Doe Nos. 1-20 and John Doe Entities Nos. 1-20 were, at all relevant times, doing business in the State of Colorado, are

5

residents of the State of Colorado for purposes of personal jurisdiction, and are subject to the jurisdiction and venue of this Court.

18.     Upon information and belief, each and every one of the defendants was the agent, co-conspirator, servant, employee, partner, joint venturer, alter ego, affiliate, successor in interest, and/or franchisee of each of the other defendants, and each was at all times acting in concert with each other, within the course, scope, and authority of such agency, service, partnership, employment, joint venture, conspiracy, affiliation and/or franchise.  All of said acts, as set forth herein, were subsequently performed with the knowledge, acquiescence, ratification, and consent of the respective principals, and the benefits thereof accepted by said principals.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

20.     At all relevant times, specific personal jurisdiction existed and exists over the STRYKER Defendants.  The following facts support specific personal jurisdiction in this matter:

a)     STRYKER, itself and through its affiliated corporations, distributors, agents, representatives, and/or employees, was engaged in the business of designing, developing, manufacturing, testing, engineering, specifying, assembling, approving, marketing, promoting, advertising, distributing, and selling medical implant devices to the consuming public in the State of Colorado.  This includes the Subject Hip Implant System, other hip implant systems, and related Stryker

medical device products sold and/or provided through STRYKER, its distributors, sales representatives, agents, and/or employees throughout the State of Colorado.

b)      STRYKER specifically advertised its implant products on a continuous basis in Colorado. Upon information and belief, it delivered brochures and other advertising materials to Colorado hospitals and Colorado physicians to induce Colorado physicians to utilize Stryker products in Colorado patients, including Plaintiff Corrine Bennington.

c)      STRYKER maintains a presence in Colorado, including but not limited to multiple dealers, sales personnel, and/or other agents throughout Colorado.

d)      A STRYKER sales representative, agent, and/or employee was in the operating room at the time the defective Subject Hip Implant System was implanted into Plaintiff Corrine Bennington in the State of Colorado.

e)      STRYKER, in conjunction with its distributors, sales representatives, agents, and/or employees, established channels for providing regular advice, products, service, and product information to Colorado patients, such as Corrine Bennington and her Colorado physicians.

f)      STRYKER's website directs Colorado patients to Colorado physicians and Colorado medical facilities where Stryker products are available to Colorado residents.

g)      STRYKER has sent information relating to recalls of implant products into the State of Colorado.

h)      At all relevant times, STRYKER served the Colorado market and expected its implant products, including hip implant products and the Subject Hip Implant System, to be sold and/or used in Colorado.

i)      Upon information and belief, STRYKER directed, shipped, and/or delivered the Subject Hip Implant System to the State of Colorado.  This may have been done through a STRYKER distributor, sales representative, agent, and/or employee.

j)      Defendant STRYKER's conduct with regard to hip implant products and other medical device products was specifically directed at Colorado consumers and their physicians in the State of Colorado, resulting in significant economic benefits for Defendant STRYKER.

k)      STRYKER undertook examination of the portions of the Subject Hip Implant System explanted from Plaintiff Corrine Bennington.

l)      STRYKER and/or its agents, representatives, and/or employees corresponded directly with Plaintiff Corrine Bennington in the State of Colorado about the subject matter of this litigation.

m)      Plaintiffs' claims are connected with and/or related to STRYKER's contacts with Colorado.

n)      There is little or no burden on STRYKER in litigating this case in a Colorado court.

21.      At all relevant times, specific personal jurisdiction existed and exists over the CORIN Defendants.  The following facts support specific personal jurisdiction in this matter:

8

a)      CORIN, itself and through its affiliated corporations, distributors, agents, representatives, and/or employees, was engaged in the business of designing, developing, manufacturing, testing, engineering, specifying, assembling, approving, marketing, promoting, advertising, distributing, and selling medical implant devices to the consuming public in the State of Colorado.  This includes the Subject Cormet Cup, other hip implant cups, other hip implant systems, and related Corin medical device products sold and/or provided by CORIN or its distributors, sales representatives, agents, and/or employees throughout the State of Colorado.

b)      CORIN specifically advertised its implant products on a continuous basis in Colorado. Upon information and belief, it delivered brochures and other advertising materials to Colorado hospitals and Colorado physicians to induce Colorado physicians to utilize Corin products in Colorado patients.

c)      CORIN maintains a significant United States presence.

d)      Upon information and belief, CORIN may maintain dealers, sales personnel, and other agents throughout Colorado.

e)      CORIN, in conjunction with its distributors, sales representatives, agents, and/or employees, established channels for providing regular advice, products, service, and product information to Colorado customers, such as Corrine Bennington and her Colorado physicians.

f)      CORIN's American website directs Colorado patients to a Colorado Physician and to a Denver, Colorado facility where Corin products are available to Colorado residents.

g)      At all relevant times, CORIN served the Colorado market and expected its implant products, including hip implant products and the Subject Cormet Cup, to be sold and/or used in Colorado.

h)      Upon information and belief, and with full knowledge, CORIN utilized STRYKER and STRYKER's distribution network to deliver and distribute Corin hip implant products throughout the State of Colorado.

i)      Upon information and belief, CORIN directed, shipped, and/or delivered the Subject Cormet Cup to the State of Colorado.  This may have been done through Defendant STRYKER and/or a distributor, sales representative, agent, and/or employee.

j)      Defendant CORIN's conduct with regard to hip implant products and other medical device products was specifically directed at Colorado consumers and their physicians in the State of Colorado, resulting in significant economic benefits for Defendant CORIN.

k)      CORIN undertook examination of portions of the Subject Hip Implant System explanted from Plaintiff Corrine Bennington.

l)      CORIN and/or its agents, representatives, and/or employees corresponded directly with Plaintiff Corinne Bennington in the State of Colorado about the subject matter of this litigation.

m)      Plaintiffs' claims are connected with and/or related to CORIN's contacts with Colorado.

n)      There is little or no burden on CORIN in litigating this case in a Colorado court.

22.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Specifically, both Plaintiffs reside in this judicial district and the defective Subject Hip Implant System and Subject Cormet Cup that are the subject of this litigation were purchased and implanted in this judicial district.  Further, all treatment necessitated by the defective products, including Corrine Bennington's 2018 revision surgery, took place within this judicial district.

## **FACTS**

23.      Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

24.      The Subject Hip Implant System is designed so that the natural hip joint is replaced with metallic components that articulate directly against one another.  A device designed to have this direct metallic articulation, without any sort of liner or buffer between ball and socket, is known within the industry as a "metal-on-metal" system.

25.      On or about August 11, 2008, Plaintiff Corrine Bennington underwent a total hip arthroplasty at a Colorado medical facility, wherein the metal-on-metal Subject Hip Implant System was implanted into Ms. Bennington's right hip.  That system contained the following:

a)      Cormet Cup, 5/54mm (i.e., the Subject Cormet Cup)

b)      Accolade TMZF Hip Stem #4.5

c)      Accolade TMZF Hip Stem #4 V-40 C-Taper Adapter Sleeve

d)      5/4MM  -4mm Unipolar Head

26.     Upon information and belief, prior to the 2008 implant surgery a STRYKER representative, employee, and/or agent may have discussed Ms. Bennington's upcoming total hip arthroplasty with her physicians, reviewed preoperative imaging, discussed the tools and implants that would be required, and/or recommended the above-stated products for use and implantation in Ms. Bennington's right hip.

27.     Upon information and belief, a STRYKER representative, employee, and/or agent provided the above-stated medical device implants for use in Ms. Bennington's August 11, 2008 total hip arthroplasty.

28.     Upon information and belief, a STRYKER representative, employee, and/or agent was present in the operating room during the August 11, 2008 total hip arthroplasty and may have given advice to the physician as to the choice of product, including the appropriate size and surgical technique.

29.     Following implantation of the above-stated STRYKER and CORIN medical implants, Plaintiff Corrine Bennington began to experience pain.   Beginning in approximately 2013, she began experiencing severe hip, groin, and leg pain, tinnitus, anemia, gastroenteritis, irritable bowel syndrome, severe skin rashes, bone loss, depression, and neurological problems.

30.     On July 21, 2017, Ms. Bennington suffered a myocardial infarction.  She underwent a cardiac catheterization on July 23, 2017 that revealed normal coronary arteries.

31.     In late August and September 2018, Ms. Bennington's physicians began to suspect that her pain and various medical problems could possibly be a result of her right hip implant.  At that time, Ms. Bennington began testing recommended by her physicians,

including x-rays, a metal artifact reduction sequence (MARS) MRI, a three-phase nuclear bone scan, and serum cobalt and chromium testing.

32.     The MARS MRI of Corrine Bennington's right hip revealed the existence of a large pseudo tumor measuring 10.3 x 5.6 x 7 cm, with extensive debris.

33.     Blood tests revealed that Corrine Bennington's serum cobalt level was 8.1 ug/L and her serum chromium level was 10.4 ug/L.

34.     Based on the results of the above-stated testing, in September 2018 Ms. Bennington's physicians, for the first time, determined the likely cause of her various medical complications was a failed metal-on-metal hip implant and metallosis.

35.     Prior to the September 2018 test results, neither Ms. Bennington nor her physicians were aware of why she was suffering from a myriad of ailments and/or what was causing her ongoing pain and medical complications.

36.     On or about November 28, 2018, Corrine Bennington underwent a surgical revision of her right hip implant, wherein some portions of that system were explanted and replaced.   During that procedure, her revision physician revised the original 2008 metal-on-metal implant to a dual mobility metal on polyethylene system.

37.     Plaintiff Corrine Bennington has been advised by physicians that she will require ongoing medical surveillance, including continued monitoring of her cobalt and chromium levels and close observation of the heart condition she developed as a result of the defective products that are the subject of this action.

## FIRST CLAIM FOR RELIEF
### (Strict Liability – STRYKER)

38.     Plaintiffs incorporate all allegations made elsewhere in this Complaint as if

set forth verbatim herein.

39.     At all relevant times, STRYKER was in the business of designing, engineering, developing, testing, approving, manufacturing, fabricating, assembling, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, wholesaling, selling, and supplying hip implant systems, including the Subject Hip Implant System, for implant into consumers, such as Plaintiff Corrine Bennington, by physicians throughout the United States, including in Colorado.

40.     At the time the Subject Hip Implant System left the control of STRYKER, it was defective in design and manufacture, lacked appropriate warnings and instructions, and was unreasonably dangerous to a person who might reasonably be expected to use it. These defects include, but are not limited to, the conditions described in the following subparagraphs:

a)     The Subject Hip Implant System was defective and unreasonably dangerous in its design and manufacture in that it corroded, fretted, and generated excessive, dangerous, and harmful levels of metal debris in patient's bodies.

b)     The Subject Hip Implant System was defective and unreasonably dangerous in its design and manufacture in that its various metal components caused and/or allowed excessive amounts of metals, including but not limited to cobalt and chromium, to be released into and accumulate in a patient's body. This defective condition causes metallosis and associated systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo-tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems;

14

cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

c)      The Subject Hip Implant System was defective and unreasonably dangerous in its design and manufacture in that it was inherently unstable, which resulted in an unreasonably high probably of early failure, requiring revision surgery.

d)      The Subject Hip Implant System was defective and unreasonably dangerous in its design to the extent it was insufficiently researched, evaluated, and/or tested.

e)      The metal-on-metal Subject Hip Implant System was especially defective and unreasonably dangerous when provided for use in full arthroplasty applications, such as the one involving Corrine Bennington.

f)      The Subject Hip Implant System's design failed to incorporate other designs and technologies that could better protect patients from foreseeable product failure and/or resulting metallosis. STRYKER was aware of such designs and technologies, including superior designs and technologies used by other manufacturers and in other hip implant systems.

g)      The Subject Hip Implant System lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the metal-on-metal Subject Hip Implant System and reasonable means to reduce such risks, dangers and harms.

h)      The Subject Hip Implant System lacked proper warnings, directions, and instructions regarding the dangerous propensities of said medical device and the

lack of adequate research, evaluation or testing of the system, including but not limited to the risk, scope, duration, and severity of the adverse reactions associated with the Subject Hip Implant System.

i)   The Subject Hip Implant System lacked reasonable, complete, and accurate information and warnings, including but not limited to the fact that the metal used in the Subject Hip Implant System was prone to increased wear and caused excessive metal debris, metallosis, and associated systemic complications including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

j)   The Subject Hip Implant System lacked post-sale warnings and/or recalls.

41.   The Subject Hip Implant System was expected by STRYKER to reach, and did reach, the user without substantial change in the condition in which it was placed on the market.

42.   Plaintiff's physician employed the Subject Hip Implant System in the manner in which STRYKER instructed the system be used, making such use reasonably foreseeable to STRYKER.

43.   Corrine Bennington was a person who would reasonably be expected to use the Subject Hip Implant System.

44.   The defects in the Subject Hip Implant System were a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

45.     STRYKER is strictly liable to the Plaintiffs for the injuries to Corrine Bennington and for injuries and damages caused by defects and inadequacies in the design, testing, manufacture, marketing, distribution, and sale of the Subject Hip Implant System.

**WHEREFORE**, Plaintiffs pray for an award of damages against STRYKER to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Negligence – STRYKER)

46.     Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

47.     At all relevant times, STRYKER was in the business of designing, engineering, developing, testing, approving, manufacturing, fabricating, assembling, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, wholesaling, selling, and supplying hip implant systems, including the Subject Hip Implant System, for implantation into consumers, such as Plaintiff Corrine Bennington, by physicians throughout the United States, including in Colorado.

48.     At all relevant times, STRYKER had a duty to exercise reasonable care in designing, testing, manufacturing, marketing, distributing, and selling the Subject Hip Implant System.

49.     At all relevant times, STRYKER had a duty to design, test, manufacture, market, distribute and sell the Subject Hip Implant System to provide reasonable safety to patients.

17

50.     At all relevant times, STRYKER had a duty to properly warn consumers and their physicians of the risks, dangers, and harms presented by the Subject Hip Implant System and reasonable means to reduce such risks, dangers and harms.

51.     At all relevant times, STRYKER had a continual duty to Plaintiff Corrine Bennington to inform her and her physician of problems being experienced with the Subject Hip Implant System and/or any component of such system, and to recall defective and unreasonably dangerous products.

52.     STRYKER negligently designed, engineered, developed, tested, approved, manufactured, fabricated, assembled, equipped, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, sold, and supplied the Subject Hip Implant System, in that it failed to exercise reasonable care to prevent the Subject Hip Implant System and its components from creating an unreasonable risk of harm to a person who might reasonably be expected to use it in an expected or reasonably foreseeable manner. STRYKER thereby breached its various duties set forth in this Count.

53.     STRYKER's acts of negligence include but are not limited to the following:

a)      STRYKER negligently failed to conduct adequate research, evaluation, and testing of metal-on-metal hip implant systems, the Subject Hip Implant System, and similar hip Implant systems, where such research, evaluation and testing would have revealed the propensity of the system to create metallic debris, cause pseudo-tumors, metallosis and associated systemic complications, and require revision surgery.

b)      STRYKER failed to design and manufacture the Subject Hip Implant System in such a way and/or with such appropriate materials so as to prevent

18

corrosion, fretting, and generation of excessive, dangerous, and harmful levels of metal debris in patient's bodies.

c)      STRYKER negligently designed and manufactured the Subject Hip Implant System in such a way and/or with such unsuitable metal components and materials that the product caused and/or allowed excessive amounts of metals, including but not limited to cobalt and chromium, to be released into and accumulate in a patient's body.   These negligent acts and/or omissions caused metallosis and associated systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo-tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

d)      STRYKER was negligent in its marketing, sale, and provision of the metal-on-metal Subject Hip Implant System for a full arthroplasty application, such as the one involving Corrine Bennington.

e)      STRYKER negligently failed to incorporate other designs and technologies into the Subject Hip Implant System that could have better protected patients from foreseeable product failure and/or resulting metallosis.   STRYKER was aware of such designs and technologies, including superior designs and technologies used by other manufacturers and in other hip implant systems, but nonetheless failed to utilize such designs and technologies in the Subject Hip Implant System.

19

f)      STRYKER failed to provide adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the metal-on-metal Subject Hip Implant System and reasonable means to reduce such risks, dangers and harms.

g)      The warnings, directions, and instructions STRYKER provided with the Subject Hip Implant System failed to adequately warn of the potential risks and side effects of the system, the dangerous propensities of said medical device, and the lack of adequate research, evaluation or testing of the system, including but not limited to the risk, scope, duration, and severity of the adverse reactions associated with the Subject Hip Implant System.  These risks were known or were reasonably scientifically knowable to STRYKER.

h)      STRYKER failed investigate the root cause of reported complications with metal-on-metal implants and/or the Subject Hip Implant System, to suspend sales and distribution of such systems, and/or to warn physicians and patients about the dangers of such systems.

i)      STRYKER failed to provide reasonable, complete, and accurate information to Plaintiff Corrine Bennington, her physician, and the orthopedic community regarding the Subject Hip Implant System and/or its components.  Specifically, STRYKER failed to disclose that the metal used in the Subject Hip Implant System was prone to increased wear and caused excessive metal debris, metallosis, and associated systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction

20

(skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

j)      STRYKER failed to properly recall, retrofit, or warn patients or physicians about the defects in and/or the danger of the Subject Hip Implant System at any time after it had been implanted in Corrine Bennington.

k)      STRYKER, though its agents, representatives, and/or employees, negligently educated Plaintiff's physician regarding the claimed advantages of the Subject Hip Implant System, negligently answered questions Plaintiff's physician asked regarding the product, negligently assisted the physician during surgery regarding implantation of the product, and negligently marketed and sold the product to Plaintiff through her physician.

The factual basis for STRYKER's negligence is also further specified in the First Claim for Relief.

54.     At the time of the design and manufacture of the Subject Hip Implant System, STRYKER knew, or in the exercise of reasonable care should have known, that the Subject Hip Implant System was defective and unreasonably harmful to patients when used in a reasonably foreseeable manner, and that the product had an unacceptable failure and complication rate.

55.     The Subject Hip Implant System had potential risks and side effects that were known or knowable to STRYKER by the use of scientific knowledge available before, at, and after the time of design, manufacture, distribution, marketing, and sale of the system to Plaintiff Corrine Bennington.   STRYKER knew, or in the exercise of

reasonable care should have known, of the defective condition, characteristics, and risks associated with said product, as set forth herein.

56.    At the time of the design and manufacture of the Subject Hip Implant System, STRYKER knew, or in the exercise of reasonable care should have known, the dangers of metal-on-metal hip implant systems, and of design characteristics necessary to assure that a hip implant system would be safe for implantation and normal use in patients.   STRYKER nonetheless failed to exercise ordinary care to design, test, manufacture, market, distribute and sell the Subject Hip Implant System.

57.    On or before August 11, 2008, the date of Plaintiff Corrine Bennington's hip replacement surgery, STRYKER knew, or in the exercise of reasonable care should have known, that the Subject Hip Implant System was failing and causing serious complications after implantation in patients.  Such complications included the patient suffering severe pain and suffering, and developing metallosis and associated systemic complications, including but not limited to bone and tissue death, pseudo tumors, tinnitus, anemia, gastroenteritis, irritable bowel syndrome, general hypersensitivity reaction (skin rash), neurological problems, cardiomyopathy, bone loss, depression, potential carcinogenic cell activity, psychological, physiological and neurological sequelae, and other complications requiring revision surgery.

58.    At the time of the design and manufacture of the Subject Hip Implant System, STRYKER knew, or in the exercise of reasonable care, should have known of alternative designs that were technologically and economically feasible and that would better protect implant patients, but STRYKER chose not to incorporate these alternative designs.

22

59.     STRYKER had an obligation to stop promoting, marketing, selling, and defending metal-on-meal hip implant systems, including the Subject Hip Implant System. STRYKER should have notified physicians who had implanted such systems of the devices' propensity to fail and for some patients to develop extremely adverse reactions to the high level of metal debris generated by normal use of the device. STRYKER should have attempted to convey this same information to patients who had been implanted with such systems. Nonetheless, STRYKER did not notify physicians or patients of the risks the Subject Hip Implant System presented.

60.     The Subject Hip Implant System that was designed, manufactured, marketed, distributed, and sold by STRYKER was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, such as Plaintiff Corrine Bennington and her physician. Such ordinary consumers, including Plaintiff and her physician, would not and could not have recognized or discovered the potential risks and side effects of the Subject Hip Implant System as set forth herein.

61.     STRYKER's knowledge as described in this Complaint is believed to be reflected in internal STRYKER communications, including memoranda and e-mail, reports of other incidents involving STRYKER implant products, STRYKER's compilations and analysis of device failure data, the results of tests conducted by STRYKER and others, and the results of other studies and analysis conducted by STRYKER and others.

62.     The Subject Hip Implant System and its components were expected to and did reach Plaintiff and her physician without substantial change in their condition as designed, manufactured, marketed, distributed, and sold by STRYKER.

63.     STRYKER breached the duties set forth herein, including but not limited to its duty to, design, test, manufacture, market, distribute and sell the Subject Hip Implant System to provide reasonable protection to patients receiving STRYKER implant devices.

64.     STRYKER's negligent acts and omissions were a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

**WHEREFORE**, Plaintiffs pray for an award of damages against STRYKER to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

**THIRD CLAIM FOR RELIEF**
**(Breach of Warranties – STRYKER)**

65.     Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

66.     Upon information and belief, warranties of future performance, express warranties, an implied warranty of merchantability, and/or an implied warranty of fitness existed with respect to the Subject Hip Implant System.

67.     STRYKER knew or had reason to know the particular purposes for which the Subject Hip Implant System and its components were required and were to be used, and that purchasers and users, such as Corrine Bennington, would rely on STRYKER's skill or judgment in designing, testing, manufacturing, marketing, distributing, and selling goods suitable for such purposes and uses.

68.     The Subject Hip Implant System and its components were not fit for the particular purposes for which they were intended, and for which they were used, nor were they of merchantable quality at the time the system was offered for sale.

69.    At the time the Subject Hip Implant System was designed, manufactured, marketed, distributed, and sold, STRYKER knew or reasonably should have known that it was not reasonably safe for the uses intended.

70.    At the time the Subject Hip Implant System was designed, manufactured, marketed, distributed, and sold, STRYKER knew or reasonably should have known that it posed unreasonable risks of injury to patients for the reasons set forth in the previous Claims for Relief.

71.    The Subject Hip Implant System did not conform to the warranties, affirmations, and representations made by STRYKER.

72.    The Plaintiffs and Corrine Bennington's physician relied to their detriment on STRYKER's express and/or implied warranties, including but not limited to warranties of future performance.

73.    The Plaintiffs were third-party beneficiaries of express and/or implied warranties, including but not limited to warranties of future performance, made by STRYKER to others.

74.    STRYKER's breach of its express and implied warranties, including but not limited to warranties of future performance, was a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

75.    Plaintiffs hereby specifically plead and provide notice to STRYKER with respect to the said breach of warranties in accord with C.R.S. 4-2-607(3).

76.    STRYKER is liable for Corinne Bennington's injuries and the resulting damages to Plaintiffs caused by its breach of warranties

**WHEREFORE**, Plaintiffs pray for an award of damages against STRYKER to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### (Strict Liability – CORIN)

77.     Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

78.     At all relevant times, CORIN was in the business of designing, engineering, developing, testing, approving, manufacturing, fabricating, assembling, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, wholesaling, selling, and supplying hip implant systems and components, including the Subject Cormet Cup, for implantation into consumers, such as Plaintiff Corrine Bennington, by physicians throughout the United States, including in Colorado.

79.     At the time the Subject Cormet Cup left the control of CORIN, it was defective in design and manufacture, lacked appropriate warnings and instructions, and was unreasonably dangerous to a person who might reasonably be expected to use it. These defects include, but are not limited to, the conditions described in the following subparagraphs:

a)     The Subject Cormet Cup was defective and unreasonably dangerous in its design and manufacture in that it corroded, fretted, and generated excessive, dangerous, and harmful levels of metal debris in patient's bodies.

b)     The Subject Cormet Cup was defective and unreasonably dangerous in its design and manufacture in that its various metal components caused and/or

allowed excessive amounts of metals, including but not limited to cobalt and chromium, to be released into and accumulate in a patient's body. This defective condition causes metallosis and associated systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo-tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

c)    The Subject Cormet Cup was defective and unreasonably dangerous in its design and manufacture in that it was inherently unstable, which resulted in an unreasonably high probably of early failure, requiring revision surgery.

d)    The Subject Cormet Cup was defective and unreasonably dangerous in its design to the extent it was insufficiently researched, evaluated, and/or tested.

e)    The Subject Cormet Cup was especially defective and unreasonably dangerous when provided for use in full arthroplasty applications, such as the one involving Corrine Bennington.

f)    The Subject Cormet Cup's design failed to incorporate other designs and technologies that could better protect patients from foreseeable product failure and/or resulting metallosis. CORIN was aware of such designs and technologies, including superior designs and technologies used by other manufacturers and in other hip implant systems.

g)      The Subject Cormet Cup lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Subject Cormet Cup and reasonable means to reduce such risks, dangers and harms.

h)      The Subject Cormet Cup lacked proper warnings, directions, and instructions regarding the dangerous propensities of said medical device and the lack of adequate research, evaluation or testing of the product, including but not limited to the risk, scope, duration, and severity of the adverse reactions associated with the Subject Cormet Cup.

i)      The Subject Cormet Cup lacked reasonable, complete, and accurate information and warnings, including but not limited to the fact that the metal used in the Subject Cormet Cup was prone to increased wear and caused excessive metal debris, metallosis, and associated systemic complications including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

j)      The Subject Cormet Cup lacked post-sale warnings and/or recalls.

80.      The Subject Cormet Cup was expected by CORIN to reach, and did reach, the user without substantial change in the condition in which it was placed on the market.

81.      Plaintiff's physician employed the Subject Cormet Cup in the manner in which Defendants instructed the system be used, making such use reasonably foreseeable to CORIN.

28

82.     Corrine Bennington was a person who would reasonably be expected to use the Subject Cormet Cup.

83.     The defects in the Subject Cormet Cup were a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

84.     CORIN is strictly liable to the Plaintiffs for the injuries to Corrine Bennington and for injuries and damages caused by defects and inadequacies in the design, testing, manufacture, marketing, distribution and sale of the Subject Cormet Cup.

**WHEREFORE**, Plaintiffs pray for an award of damages against CORIN to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
### (Negligence – CORIN)

85.     Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

86.     At all relevant times, CORIN was in the business of designing, engineering, developing, testing, approving, manufacturing, fabricating, assembling, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, wholesaling, selling, and supplying hip implant systems, including the Subject Cormet Cup, for implantation into consumers, such as Plaintiff Corrine Bennington, by physicians throughout the United States, including in Colorado.

87.     At all relevant times, CORIN had a duty to exercise reasonable care in designing, testing, manufacturing, marketing, distributing, and selling the Subject Cormet Cup.

88.     At all relevant times, CORIN had a duty to design, test, manufacture, market, distribute, and sell the Subject Cormet Cup to provide reasonable safety to patients.

89.     At all relevant times, CORIN had a duty to properly warn consumers and their physicians of the risks, dangers, and harms presented by the Subject Cormet Cup and reasonable means to reduce such risks, dangers and harms.

90.     At all relevant times, CORIN had a continual duty to Plaintiff Corrine Bennington to inform her and her physician of problems being experienced with the Subject Cormet Cup and/or any component of such system, and to recall defective and unreasonably dangerous products.

91.     CORIN negligently designed, engineered, developed, tested, approved, manufactured, fabricated, assembled, equipped, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, sold, and supplied the Subject Cormet Cup, in that it failed to exercise reasonable care to prevent the Subject Cormet Cup and its components from creating an unreasonable risk of harm to a person who might reasonably be expected to use it in an expected or reasonably foreseeable manner. CORIN thereby breached its various duties set forth in this Count.

92.     CORIN's acts of negligence include but are not limited to the following:

a)     CORIN negligently failed to conduct adequate research, evaluation, and testing of metal-on-metal hip implant systems, the Subject Cormet Cup, and similar hip cups or implant systems, where such research, evaluation and testing would have revealed the propensity of the system to create metallic debris, cause

pseudo-tumors, metallosis and associated systemic complications, and require revision surgery.

b) CORIN failed to design and manufacture the Subject Cormet Cup in such a way and/or with such appropriate materials so as to prevent corrosion, fretting, and generation of excessive, dangerous, and harmful levels of metal debris in patient's bodies.

c) CORIN negligently designed and manufactured the Subject Cormet Cup in such a way and/or with such unsuitable metal components and materials that the product caused and/or allowed excessive amounts of metals, including but not limited to cobalt and chromium, to be released into and accumulate in a patient's body. These negligent acts and/or omissions caused metallosis and associated systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo-tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

d) CORIN was negligent in its marketing, sale, and provision of the Subject Cormet Cup for a full arthroplasty application, such as the one involving Corrine Bennington.

e) CORIN negligently failed to incorporate other designs and technologies into the Subject Cormet Cup that could have better protected patients from foreseeable product failure and/or resulting metallosis. CORIN was aware of such designs and

technologies, including superior designs and technologies used by other manufacturers and in other hip cup and hip implant systems, but nonetheless failed to utilize such designs and technologies in the Subject Cormet Cup.

f)      CORIN failed to provide adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Subject Cormet Cup and reasonable means to reduce such risks, dangers and harms.

g)      The warnings, directions, and instructions CORIN provided with the Subject Cormet Cup failed to adequately warn of the potential risks and side effects of the product, the dangerous propensities of said medical device especially when used in conjunction with other metal hip components, and the lack of adequate research, evaluation or testing of the product, including but not limited to the risk, scope, duration, and severity of the adverse reactions associated with the Subject Cormet Cup.   These risks were known or were reasonably scientifically knowable to CORIN.

h)      CORIN failed investigate the root cause of reported complications with metal-on-metal implants and/or the Subject Cormet Cup, to suspend sales and distribution of such products, and/or to warn physicians and patients about the dangers of such products.

i)      CORIN failed to provide reasonable, complete, and accurate information to Plaintiff Corrine Bennington, her physician, and the orthopedic community regarding the Subject Cormet Cup and/or its components.   Specifically, CORIN failed to disclose that the metal used in the Subject Cormet Cup was prone to increased wear and caused excessive metal debris, metallosis, and associated

32

systemic complications, including but not limited to the following: severe hip, groin, and leg pain; bone and tissue death; pseudo tumors; tinnitus; anemia; gastroenteritis; irritable bowel syndrome; general hypersensitivity reaction (skin rash); neurological problems; cardiomyopathy; bone loss; depression; potential carcinogenic cell activity; and psychological, physiological and neurological sequelae.

j)       CORIN failed to properly recall, retrofit, or warn patients or physicians about the defects in and/or the danger of the Subject Cormet Cup at any time after it had been implanted in Corrine Bennington.

The factual basis for CORIN's negligence is also further specified in the Fourth Claim for Relief.

93.    At the time of the design and manufacture of the Subject Cormet Cup, CORIN knew, or in the exercise of reasonable care should have known, that the Subject Cormet Cup was defective and unreasonably harmful to patients when used in a reasonably foreseeable manner, and that the product had an unacceptable failure and complication rate.

94.    The Subject Cormet Cup had potential risks and side effects that were known or knowable to CORIN by the use of scientific knowledge available before, at, and after the time of design, manufacture, distribution, marketing, and sale of the system to Plaintiff Corrine Bennington. Defendant knew, or in the exercise of reasonable care should have known, of the defective condition, characteristics, and risks associated with said product, as set forth herein.

95.     At the time of the design and manufacture of the Subject Cormet Cup, CORIN knew, or in the exercise of reasonable care should have known, the dangers of metal-on-metal hip implant systems, and of design characteristics necessary to assure that a hip implant system would be safe for implantation and normal use in patients. CORIN nonetheless failed to exercise ordinary care to design, test, manufacture, market, distribute and sell the Subject Cormet Cup.

96.     On or before August 11, 2008, the date of Plaintiff Corrine Bennington's hip replacement surgery, CORIN knew, or in the exercise of reasonable care should have known, that the Subject Cormet Cup was failing and causing serious complications after implantation in patients.  Such complications included the patient suffering severe pain and suffering, and developing metallosis and associated systemic complications, including but not limited to bone and tissue death, pseudo tumors, tinnitus, anemia, gastroenteritis, irritable bowel syndrome, general hypersensitivity reaction (skin rash), neurological problems, cardiomyopathy, bone loss, depression, potential carcinogenic cell activity, psychological, physiological and neurological sequelae, and other complications requiring revision surgery.

97.     At the time of the design and manufacture of the Subject Cormet Cup, CORIN knew, or in the exercise of reasonable care, should have known of alternative designs that were technologically and economically feasible and that would better protect implant patients, but CORIN chose not to incorporate these alternative designs.

98.     CORIN had an obligation to stop promoting, marketing, selling, and defending metal-on-meal hip implant products, including the Subject Cormet Cup. CORIN should have notified physicians who had implanted such products of the devices'

propensity to fail and for some patients to develop extremely adverse reactions to the high level of metal debris generated by normal use of the device.  CORIN should have attempted to convey this same information to patients who had been implanted with such devices.  Nonetheless, CORIN did not notify physicians or patients of the risks the Subject Cormet Cup presented.

99.     The Subject Cormet Cup that was designed, manufactured, marketed, distributed, and sold by CORIN was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, such as Plaintiff Corrine Bennington. Such ordinary consumers, including Plaintiff and her physician, would not and could not have recognized or discovered the potential risks and side effects of the Subject Cormet Cup as set forth herein.

100.    CORIN's knowledge as described in this Complaint is believed to be reflected in internal CORIN communications, including memoranda and e-mail, reports of other incidents involving CORIN implant products, CORIN's compilations and analysis of failure data, the results of tests conducted by CORIN and others, and the results of other studies and analysis conducted by CORIN and others.

101.    The Subject Cormet Cup and its components were expected to and did reach Plaintiff and her physician without substantial change in their condition as designed, manufactured, marketed, distributed, and sold by CORIN.

102.    CORIN breached the duties set forth herein, including but not limited to its duty to design, test, manufacture, market, distribute and sell the Subject Cormet Cup to provide reasonable protection to patients receiving CORIN implant devices.

103.   CORIN's negligent acts and omissions were a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

**WHEREFORE**, Plaintiffs pray for an award of damages against CORIN to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
### (Breach of Warranties – CORIN)

104.   Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

105.   Upon information and belief, warranties of future performance, express warranties, an implied warranty of merchantability, and/or an implied warranty of fitness existed with respect to the Subject Cormet Cup.

106.   CORIN knew or had reason to know the particular purposes for which the Subject Cormet Cup and its components were required and were to be used, and that purchasers and users, such as Corrine Bennington, would rely on CORIN's skill or judgment in designing, testing, manufacturing, marketing, distributing, and selling suitable for such purposes and uses.

107.   The Subject Cormet Cup and its components were not fit for the particular purposes for which they were intended, and for which they were used, nor were they of merchantable quality at the time the system was offered for sale.

108.   At the time the Subject Cormet Cup was designed, manufactured, marketed, distributed, and sold, CORIN knew or reasonably should have known that it was not reasonably safe for the uses intended.

109.    At the time the Subject Cormet Cup was designed, manufactured, marketed, distributed, and sold, CORIN knew or reasonably should have known that it posed unreasonable risks of injury to patients for the reasons set forth in the previous Claims for Relief.

110.    The Subject Cormet Cup did not conform to the warranties, affirmations, and representations made by CORIN.

111.    The Plaintiffs and Corrine Bennington's physician relied to their detriment on CORIN's express and/or implied warranties, including but not limited to warranties of future performance.

112.    The Plaintiffs were third-party beneficiaries of express and/or implied warranties, including but not limited to warranties of future performance, made by CORIN to others.

113.    CORIN's breach of its express and implied warranties, including but not limited to warranties of future performance, was a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

114.    Plaintiffs hereby specifically plead and provide notice to CORIN with respect to the said breach of warranties in accord with C.R.S. 4-2-607(3).

115.    CORIN is liable for Corinne Bennington's injuries and the resulting damages to Plaintiffs caused by its breach of warranties

**WHEREFORE**, Plaintiffs pray for an award of damages against CORIN to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF**

37

**(Violation of the Colorado Consumer Protection Act – All Defendants)**

116.    Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

117.    At all relevant times, STYRKER and CORIN were doing business in the State of Colorado and offering their products for sale to all Colorado residents through Colorado physicians.

118.    In the course of their businesses, STRYKER and CORIN engaged in deceptive trade practices and/or caused another to engage in deceptive trade practices by knowingly making false representation(s) about the characteristics, uses, benefits and qualities of the Subject Hip Implant System and Subject Cormet Cup, including but not limited to making representations that such products were safe and non-defective.  Such claims were made despite knowing and/or having reason to know these representations were false when made.   Accordingly, STRYKER and CORIN violated C.R.S. 6-1-105(1)(e).

119.    In the course of their businesses, STRYKER and CORIN made false representations to the effect that their implant products were of a particular standard and quality, including but not limited to being safe and non-defective, at a time when the Defendants knew these representations were false.    In particular, in marketing, distributing and selling the Subject Hip Implant System and Subject Cormet Cup, STRYKER and CORIN failed to disclose material information relating to the safety of the Subject Hip Implant System and Subject Cormet Cup that were known at the time they advertised and sold them, including but not limited to the dangerous nature of metal-on-metal implants, and thereby intended to induce consumers and their physicians to

purchase and implant products they otherwise would not have purchased or used had this information been disclosed. Such information included failure to warn of the Subject Hip Implant System's and Subject Cormet Cup's defects (as set forth in the previous Claims for Relief and incorporated herein) and failure to provide consumers and their physicians with information regarding how these medical devices would perform, what safety alternatives existed but were not provided, and the consequences of failing to provide such safer alternatives. Accordingly, STRYKER and CORIN violated C.R.S. 6-1-105(1)(g).

120.    In the course of their businesses, STRYKER and CORIN advertised their products with intent not to sell them as advertised.  These Defendants engaged in such practices by advertising safe and effective products but providing defective and unsafe products.  They did so by advertising in such a way as would cause a reasonable person of ordinary intelligence to understand and reasonably expect that they would receive safe products if they purchased and used the Subject Hip Implant System and Subject Cormet Cup and/or other similar products.  However, the subject products were defective (as set forth elsewhere in this Complaint and incorporated herein), so the Subject Hip Implant System and Subject Cormet Cup were different from that advertised. Accordingly, STRYKER and CORIN violated C.R.S. 6-1-105(1)(i).

121.    In the course of their businesses, STRYKER and CORIN failed to disclose material information relating to the safety of the Subject Hip Implant System and Subject Cormet Cup, including but not limited to the fact that metal-on-metal implant devices were dangerous and could likely result in corrosion and fretting that would generate excessive, dangerous, and harmful levels of metal debris release and accumulation in patient's

bodies, and that this could cause metallosis and associated systemic complications. Advertising and sale of these products tended to deceive and mislead consumers and their physicians into believing that such products were safe and fit for their intended uses, including but not limited to adequately safe for use in a total hip arthroplasty. Accordingly, STRYKER and CORIN violated C.R.S. 6-1-105(1)(u).

122. Upon information and belief, STRYKER and CORIN knew the representations set forth herein were false when made based upon information they knew or had reason to know, which was contained in internal communications, including memoranda and email, reports of other incidents involving the same or similar metal-on-metal implant products, in compilations and analysis of device failure data, and in the results of tests, studies, and analysis conducted by the respective defendants and others.

123. Upon information and belief, other persons were also induced to purchase and use STRYKER's and CORIN's metal-on-metal implant devices that were the same or similar to the Subject Hip Implant System and Subject Cormet Cup. These products contain design defects, so all such individuals would have also received defective and unreasonably dangerous products that were different from the safe and non-defective products and services advertised.

124. Upon information and belief, before and after the purchase and implant of the Subject Hip Implant System and Subject Cormet Cup, thousands of other consumers and their physicians were exposed to the type of advertising that Plaintiff and her physician were exposed to. STRYKER and CORIN knew such individuals would reasonably rely on such advertising. CORIN and STRYKER made similar false statements to those consumers and their physicians knowing they would be relied upon

by them, and such individuals were likewise induced by such advertising to purchase products like the Subject Hip Implant System and Subject Cormet Cup. All such other people who purchased the Defendants' similar products were harmed in that they were receiving defective and unreasonably dangerous medical device implants. Thus, in engaging in the said deceptive trade practices as to the Plaintiff and others, STRYKER and CORIN engaged in practices that significantly impacted the public as actual or potential consumers of the Defendants' goods.

125. The activities described in this Count and described in this Complaint were undertaken in the course of STRYKER's and CORIN's businesses.

126. Such representations and activities took place in the State of Colorado.

127. Plaintiff Corrine Bennington and her physician were actual and potential users and consumers of the Defendants' respective goods.

128. As a result of STRYKER's and CORIN's deceptive trade practices, Plaintiff, as a potential and actual consumer of the Defendants' goods, was implanted with products that were unsafe and unreasonably dangerous, and was injured by such products as set forth elsewhere in this Complaint and incorporated herein. Accordingly, Plaintiffs sustained an injury to legally protected interests.

129. STRYKER's and CORIN's deceptive trade practices were a direct and proximate cause of the injuries to Corrine Bennington and the resulting damages to Plaintiffs.

130. The actions described in this Count constitute deceptive trade practices pursuant to Colorado Revised Statutes § 6-1-105. Pursuant to Colorado Revised Statutes § 6-1-113, Plaintiffs are entitled to treble damages, costs, and attorney fees.

**WHEREFORE**, Plaintiffs pray for an award of damages against the Defendants, and each of them, to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF
### (Loss of Consortium – All Defendants)

131.    Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

132.    Plaintiff Stephen Bennington, as the husband of Corrine Bennington and as a member of the household of Corrine Bennington, enjoyed a close familial relationship with Corrine Bennington.

133.    As a proximate result of the acts and omissions of the Defendants, as set forth herein, Stephen Bennington has lost the love, support, companionship, affection, consortium, care, comfort, household services, aid and society of his wife, Corrine Bennington.

**WHEREFORE**, Plaintiffs pray for an award of damages against the Defendants, and each of them, to be fixed by the trier of fact in a reasonable amount, and for such other and further relief as the Court deems just and proper.

### <u>DAMAGES</u>

134.    Plaintiffs incorporate all allegations made elsewhere in this Complaint as if set forth verbatim herein.

135.    As a direct and proximate result of the Defendants' acts and omissions set forth herein, Plaintiff Corrine Bennington has incurred and seeks the following general and special damages, without limitation:

a)      Past and future physical and mental pain and suffering, emotional stress, and extreme mental anguish;

b)      Past and future medical, hospital and rehabilitation care and services, nursing care and services, life care and attendant services, medication, therapy and other expenses, including special medical damages;

c)      Inconvenience;

d)      Loss of enjoyment of life, and impairment and loss of the quality and value of life; impairment of the quality of life

e)      Loss of household services and other economic damages;

f)      Temporary and permanent physical impairment;

g)      Temporary and permanent disfigurement;

h)      Attorney's fees, treble damages, costs, and other remedies available under the Colorado Consumer Protection Act; and

i)      All such other relief and compensatory damages as are permissible at common law and by statute and to which Corrine Bennington is entitled.

136.    As a direct and proximate result of the Defendant's acts and omissions set forth herein, Plaintiff Stephen Bennington has incurred and seeks the following damages, without limitation:

a)      Loss of love, support, companionship, affection, consortium, care, comfort, household services, aid and society of his wife, Corrine Bennington;

b)      Loss of household services and other economic damages;

c)      Attorney's fees, treble damages, costs, and other remedies available under the Colorado Consumer Protection Act; and

d)      All such other relief and compensatory damages as are permissible at common law and by statute and to which Stephen Bennington is entitled.

**WHEREFORE**, Plaintiffs pray for Judgment against the Defendants, and each of them, in an amount to be determined at trial and for the costs of this suit, pre-judgment and post-judgement interest, costs and expert witness fees, and for such other and further relief as the Court may deem proper.

### JURY DEMAND

Trial to a Jury of six (6) is demanded on all issues so triable.

Dated this 30th day of April 2020.

Respectfully submitted,

**JORDAN HERINGTON & ROWLEY**

*s/ Anne M. Dieruf*
Jason W. Jordan
Anne M. Dieruf
5445 DTC Parkway, Suite 1000
Greenwood Village, CO 80111
Phone: (303) 766-8153
Fax: (303) 766-5568
Email: jason@jordanlaw.com
          anne@jordanlaw.com

*Attorneys for Plaintiffs*

Plaintiffs' Address:
1579 Moraine Circle
Steamboat Springs, CO 80487