IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:20-cv-01211-CNS-KLM

CORINNE BENNINGTON, a Colorado resident,

　　　Plaintiff,

v.

STRYKER CORPORATION, a Michigan corporation,
STRYKER SALES CORPORATION, Michigan corporation,
HOWMEDICA OSTEONICS CORPORATION, a New Jersey corporation,
DOES 1-20, inclusive and
DOE ENTITIES 11-20, inclusive,

　　　Defendants.

**ORDER**

This matter comes before the Court on Defendants' Motion for Summary Judgment (ECF No. 88). For the following reasons, the Court DENIES the motion.

**I. UNDISPUTED MATERIAL FACTS**

On August 11, 2008, Plaintiff underwent a total hip arthroplasty (i.e., a hip replacement procedure), during which four prosthetic components intended for three different surgical procedures were implanted into her right hip:

- **Cormet® Cup, 5/54mm (the "Cormet Cup")** – intended for "resurfacing" procedures in which the hip socket is shaved down and fitted with a cup implant, and a cap implant that

1

- fits over the natural ball of the femur mates with the cup implant (i.e., includes no ball implant).

- **Accolade TMZF Hip Stem #4.5** – intended for "total arthroplasty" procedures in which the entire hip joint, including the hip socket, ball, and neck of the femur are all replaced with implants (i.e., includes cup, ball, and stem implants).

- **Accolade TMZF Hip Stem #4 v-40 C-Taper Adapter Sleeve** – also intended for total arthroplasty procedures.

- **5/4MM-4mm Cormet® Unipolar Modular Head (the "Unipolar Modular Head")** – intended for "hemi-arthroplasty" procedures in which only the neck and ball of the femur are replaced with implants, with the ball implant mating with the natural hip socket (i.e., includes no cup implant).

(ECF No. 88, ¶ 1; *see* ECF No. 95-1, ¶ 8; *see also* ECF Nos. 95-3, 95-4). The Cormet Hip Resurfacing System, of which the Cormet Cup is a component, received its premarket approval (PMA) designation from the FDA on July 3, 2007 (ECF No. 88, ¶ 2; *see* ECF No. 95-10). Meanwhile, the Unipolar Modular Head received its § 510(k) substantial equivalency finding from the FDA on April 3, 2007 (ECF No. 88, ¶ 3; *see* ECF No. 95-8).

In 2013, Plaintiff began to experience "severe hip, groin, and leg pain, tinnitus, anemia, gastroenteritis, irritable bowel syndrome, severe skin rashes, bone loss, depression, and neurological problems" (*see* ECF No. 59, ¶ 22; *see also* ECF No. 95-5 at 74:23–77:17, 106:20–107:8, 117:1–118:11, 190:2–24). In 2017, Plaintiff suffered a heart attack despite having normal coronary arteries (*see* ECF No. 59, ¶ 23; *see also* ECF No. 95-5 at 107:3–8). In 2018, medical testing revealed that Plaintiff had developed a "large pseudotumor" in her right hip with "extensive

debris," and that the levels of cobalt and chromium in her blood were elevated (*see* ECF No. 59, ¶¶ 25–26; *see also* ECF No. 88-2 at 95:17–23; ECF No. 95-5 at 131:15–25). Based on the results of this testing, Plaintiff's physicians "determined the likely cause of her various medical complications was a failed metal hip implant and metallosis" (*see* ECF No. 59, ¶ 27; *see also* ECF No. 88, ¶ 8).

On November 28, 2018, Plaintiff underwent a surgical revision of her right hip implant; during this procedure, the Cormet Cup was left in place, while the Unipolar Modular Head was removed and replaced with a nonmetal, polyethylene device (ECF No. 59, ¶ 29; ECF No. 95-6 at 30:5–31:17). Following this procedure, Plaintiff's symptoms drastically improved (ECF No. 95-5 at 166:25–167:6). Plaintiff's physicians have advised, however, that "she will require ongoing medical surveillance, including continued monitoring of her cobalt and chromium levels and close observation of the heart condition she developed" (*see* ECF No. 59, ¶ 30).

Plaintiff now brings claims for (i) strict liability, because the Unipolar Modular Head "was defective in design and manufacture, lacked appropriate warnings and instructions, and was unreasonably dangerous to a person who might reasonably be expected to use it"; (ii) negligence, because Defendants "failed to exercise reasonable care to prevent the [Unipolar Modular Head] from creating an unreasonable risk of harm" to patients like Plaintiff; (iii) breach of express and implied warranties under C.R.S. §§ 4-2-313 and -315, respectively; and (iv) violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-105(1) (*see generally* ECF No. 59).

## II.  LEGAL STANDARD

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003); Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And generally, where a party raises real issues of credibility, motive, or intent, the matter is unsuited for summary judgment. *Baum v. Gillman*, 648 F.2d 1292, 1295–96 (10th Cir. 1981).

### III.  ANALYSIS

Here, Defendants move for summary judgment on three grounds: (i) Plaintiff's state-law claims are expressly preempted by the MDA; (ii) Plaintiff's claims may not proceed because there is no private cause of action for promotion of "off-label" uses of medical devices; and (iii) collectively, Defendants are an "innocent seller" against whom product liability actions may not proceed. For the reasons set forth below, the Court rejects each of these grounds for summary judgment and DENIES the motion in its entirety.

**a.  The MDA does not expressly preempt Plaintiff's state-law tort claims.**

Defendants move for summary judgment as to all claims set forth in the Second Amended Complaint, arguing that these claims are expressly preempted by the Medical Device Amendments of 1976, 21 U.S.C. § 360c, *et seq.* (MDA). More specifically, Defendants argue that Plaintiff's

4

claims are based on the combined failure of the Cormet Cup (a PMA-approved device to which MDA preemption attaches) and the Unipolar Modular Head (a § 510(k)-cleared component that Defendants claim "was identical in material composition and geometry to the original PMA-approved component") (ECF No. 88 at 2; *see id.* at 8–17). Among other arguments, Plaintiff counters that her claims relate solely to defects in the Unipolar Modular Head, meaning that MDA preemption does not apply (*see* ECF No. 95 at 6–15). Upon reviewing the available factual record and construing it in the light most favorable to the nonmovant, *Self*, 439 F.3d at 1230, the Court agrees with Plaintiff that her claims are not preempted.

Congress has the power to preempt state law. *See* U.S. Const. art IV. Because of the supremacy of federal law, any state common law or statute that conflicts with federal law is without effect. *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1128–29 (10th Cir. 2007) (citations omitted). Relevant here, express preemption occurs when Congress "define[s] explicitly the extent to which its enactments pre-empt state law." *Id.* at 1129 (quoting *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir. 2000)).

The MDA, the federal law at issue here, standardizes and imposes federal oversight over the introduction of new medical devices into the market. It provides that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The level of oversight for MDA-covered medical devices exists on a sliding scale depending on the risks they present; relevant here, Class III devices (like pacemakers, deep-

5

brain stimulators, and other medical implants) are high-risk devices that are critical to sustaining life or health and, as such, generally undergo a rigorous premarket approval (PMA) process overseen by the FDA. *See* 21 U.S.C. § 360e(c)(1). However, a new Class III device need not undergo premarket approval if the FDA finds it is "substantially equivalent" to another device exempt from premarket approval. *See* 21 U.S.C. § 360c(f)(1)(a). The FDA's less-stringent review for substantial equivalence is known as the § 510(k) process.

In *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), the U.S. Supreme Court established a two-prong test to evaluate whether the MDA expressly preempts a state-law claim. Specifically, a court must assess (1) "whether the federal government has established requirements applicable to" a medical device, and (2) whether the state-law claim imposes a requirement "that relates to the safety or effectiveness" of the medical device that is "different from, or in addition to" the federal requirements. *Id.* at 321–23.

With respect to *Riegel*'s first prong, the Supreme Court has noted that the PMA approval process imposes certain federal "requirements" upon Class III devices, because "the FDA may grant premarket approval only after it determines that a device offers reasonable assurance of safety and effectiveness." *Id.* at 323. By contrast, devices approved through the less stringent § 510(k) process have not undergone the same review for safety or efficacy under the MDA, because the focus of that process is on "equivalence, not safety." *Id.* at 322–24. Putting this distinction more simply, while all PMA-approved devices satisfy the first *Riegel* prong, § 510(k)-cleared devices do not.

With respect to *Riegel*'s second prong, state-law tort claims are subject to MDA preemption if these claims impose "different" or "additional" requirements than those imposed

through the federal PMA approval process. The Supreme Court has noted, however, that the MDA does not preempt "parallel" state-law claims (i.e., claims based on tort duties that mirror federal requirements set forth in FDA regulations). *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 494–95 (1996).

In the instant case, whether the MDA preempts Plaintiff's state-law claims depends on the nature of the device on which Plaintiff bases her claims. And in attempting to answer this question, Defendants do not write on a blank slate; a brief review of the relevant procedural history appears to be warranted. After Plaintiff filed her Second Amended Complaint, Defendants moved to dismiss under Rule 12(b)(6), setting forth substantially the same preemption defense as is now before the Court. More specifically, Defendants argued that Plaintiff's claim was based on "the alleged failure of the 510(k)-device combined with the PMA-approved device," and that when the Unipolar Modular Head and the Cormet Cup are analyzed as hybrid system (rather than at the component level), Plaintiff's claims are expressly preempted by the MDA (ECF No. 60 at 2, 10–12). The Magistrate Judge recommended that the motion be denied (*see* ECF No. 67; *see also* ECF No. 72 (adopting the recommendation)). In so recommending, the Court noted that Plaintiff had alleged that the Unipolar Modular Head "was defective and unreasonably dangerous as it corroded and generated harmful levels of metal debris in Plaintiff's body," that Plaintiff had *not* alleged that any other components of her hip implant were defective, and, consequently, that Plaintiff had "raise[d] claims only against a § 510(k)-cleared device" (ECF No. 67 at 12). The Court further reasoned that (i) the Unipolar Modular Head is not a component of the PMA-approved Cormet Hip Resurfacing System, (ii) even if it were, such a "hybrid system" is properly analyzed at the component level, and (iii) examining the Unipolar Modular Head as an individual component

7

reveals that it is a § 510(k)-cleared device (*id.* at 12–14). Based on the posture of the case at that time, the Court concluded:

> The facts . . . do not suggest that the metallosis suffered by Plaintiff was necessarily because of an interaction of the § 510(k)-cleared Unipolar Modular Head with the PMA-approved Cormet Resurfacing System. Bearing in mind that at this stage all facts plead are assumed to be true, this Court cannot assume that a PMA-approved device was necessarily part of the causation for Plaintiff's injuries and thus cannot find that Plaintiff's claims are preempted. This Court does not find at this time that the Unipolar Modular Head was part of a hybrid system with the Cormet Resurfacing System; however, following the development of facts during the discovery process, a preemption analysis may again be appropriate at the summary judgment stage.

(*id.* at 14–15).

This procedural history brings us to the instant summary judgment motion, where Defendants argue, based on facts developed during discovery and the testimony of Plaintiff's experts, that Plaintiff's claims do not hinge on the Unipolar Modular Head being independently defective—rather, they rest on the harmful, metal-on-metal interaction of the Cormet Cup and the Unipolar Modular Head. In other words, according to Defendants, Plaintiff's claims are really based on the alleged failure of a "hybrid" version of the Cormet Hip Resurfacing System, where the Unipolar Modular Head was used in place of the system's femoral resurfacing head, and the Unipolar Modular Head and the system's femoral resurfacing head were identical in geometry and material composition (ECF No. 88 at 10–11). Now that discovery has closed and the facts underlying Plaintiff's claims have been developed, however, the Court's earlier preemption analysis remains essentially unchanged. This is so for three reasons.

First, Plaintiff has now adduced evidence in support of her allegation that the § 510(k)-cleared Unipolar Modular Head, standing alone, is the device giving rise to her claims. For

instance, Plaintiff's product design expert, Mari Truman, opined in deposition that the relevant design defect in this case "was the use of the Unipolar Modular Head with the metal bearing acetabular cup" (*see* ECF No. 88-2 at 6:14–25). Ms. Truman further clarified via affidavit[1] that "the unipolar ball should never have been provided with a metal cup of any kind," regardless of the metal cup's type, shape, or design (ECF No. 95-1, ¶ 11 (emphasis in original)). Moreover, Plaintiff has made no complaints about the PMA-approved Cormet Cup to which the Unipolar Modular Head was improperly mated—indeed, Plaintiff points out that she still has the Cormet Cup implanted in her hip "but, following removal of the defective ball, her symptoms improved" (ECF No. 95 at 14; *see* ECF No. 95-5 at 166:25–167:6). In view of this evidence, Plaintiff has alleged sufficient facts demonstrating that her injuries were not *necessarily* caused by the interaction of the § 510(k)-cleared Unipolar Modular Head and the PMA-approved Cormet Cup. Rather, as Plaintiff puts it, Defendants' "provision of the [Unipolar Modular Head] for use with *any* metal articulating surface is an independent defect, as is the ball's failure to warn against any such use" (ECF No. 95 at 14 (emphasis added)). At bottom, because Plaintiff's evidence places the locus of her injury exclusively on the § 510(k)-cleared Unipolar Modular Head when mated with *any* metal cup, PMA-approved or not, a finding of preemption is unwarranted.

Second, and closely related, Plaintiff has not alleged claims against any "hybrid" device consisting of both PMA-approved and § 510(k)-cleared components. Here, as they did at the Rule 12(b)(6) stage, Defendants argue that the Unipolar Modular Head was used as a "component" of the PMA-approved Cormet Hip Resurfacing System, and that when the components are analyzed

---

[1] Defendants urge the Court to disregard Ms. Truman's affidavit as a "sham affidavit" propounded in an effort to create a fact issue for trial (*see* ECF No. 96 at 4–7*; see also Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)). The Court finds, however, that the contents of Ms. Truman's affidavit do not contradict her earlier deposition testimony.

together as a "hybrid" unit, preemption applies (ECF No. 88 at 10–14). Even after the close of discovery, however, the operative facts about the subject devices remain the same and, thus, the same problems with Defendants' argument previously identified by the Magistrate Judge persist here.

In particular, the Court agrees with Plaintiff and the Magistrate Judge that the Unipolar Modular Head, regardless of how it was actually used in this case, is not a "component" of the PMA-approved Cormet Hip Resurfacing System (*see* ECF No. 67 at 12–13; ECF No. 95 at 8–10). The FDA has denoted, for instance, that the Unipolar Modular Head is a "device" in and of itself, not a component of any system:

> This letter will allow you to begin marketing your *device* as described in your Section 501(k) premarket notification. The FDA finding of substantial equivalence of your *device* to a legally marketed predicate device results in a classification for your *device* and thus, permits your *device* to proceed to the market.

(*See* ECF No. 67 at 13 (emphasis in original); *see also* ECF No. 95-8 at 4). Furthermore, the FDA has implicitly acknowledged that the Unipolar Modular Head was not designed for use with the Cormet Hip Resurfacing System; in fact, the PMA-approved system did not include *any* modular femoral head:

> Currently, Corin does not have a commercially available modular femoral head for use with the Cormet resurfacing shell. If the Cormet resurfacing head must be revised to a total hip arthroplasty, the acetabular shell should also be revised even if it is well fixed.

(*See* ECF No. 67 at 13; *see also* ECF No. 95-10 at 10). On this latter point, however, Defendants advance a new argument not earlier raised at the Rule 12(b)(6) stage—according to Defendants, the Unipolar Modular Head should still be considered a component of the Cormet Hip Resurfacing System based on how it was used in this case, because it was substituted for a part in the system

that was "identical in material composition and geometry" (ECF No. 88, ¶¶ 13–14; *see id.* at 10, 14). This argument is wholly unconvincing. Even if the Unipolar Modular Head and the resurfacing head included in the Cormet Hip Resurfacing System were actually identical—and the evidence suggests strongly that they are not (*see* ECF No. 95-1, ¶ 19; ECF No. 95-4)—it simply does not follow that close physical similarity between a PMA-approved product and a § 510(k)-cleared product automatically bestows MDA preemption on the § 510(k)-cleared product. To conclude otherwise would run counter to the purpose of the MDA and settled Supreme Court caselaw declining to apply preemption to devices that have received only § 510(k) clearance. *See Lohr*, 518 U.S. at 494 ("There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo . . . . That status quo included the possibility that the manufacturer of the device would have to defend itself against state-law [tort] claims.")

Third and finally, the Court declines Defendants' repeated invitation to analyze the components of Plaintiff's hip implant together as a whole system for preemption purposes. To the contrary, the Court concludes that an analysis at the component level, not at the system level, is appropriate when examining "hybrid systems" like the one at issue here. *See Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 772 (3d Cir. 2018) ("[T]he statutory definition of 'device,' the treatment of off-label uses, and the guidance of the FDA all counsel in favor of scrutinizing hybrid systems at the component-level."). To that end, as the Magistrate Judge so aptly put it, "even if the Unipolar Modular Head was a component of a 'hybrid system' . . . this Court could easily examine each component and see that the Unipolar Modular Head is a § 510(k)-cleared product, and therefore, Plaintiff's claims are not expressly preempted" (ECF No. 67 at 14).

In sum, because Defendants have not shown that that Plaintiff's state-law claims hinge on defects in any PMA-approved device, they cannot meet prong one of *Riegel* (i.e., showing that the federal government has established "requirements" applicable to a subject device). The Court therefore need not examine prong two of *Riegel* (i.e., analyzing whether the state-law claims impose requirements that are "different from, or in addition to" the federal requirements). *See Riegel*, 552 U.S. at 321–23. Instead, the Court concludes here that Plaintiff's state-law claims are not subject to MDA preemption. Defendants' motion for summary judgment, to the extent that it argues that Plaintiff's claims are expressly preempted, is therefore DENIED.

**b. Plaintiff's claims are not premised on violations of the FDCA or other federal regulations.**

Defendants also move for summary judgment to the extent that Plaintiff's claims are premised on their alleged promotion of an "off-label" use of the Unipolar Modular Head, because there is no private cause of action for promotion of "off-label" uses of medical devices (*see* ECF No. 88 at 17–19). More specifically, Defendants observe that the Federal Food, Drug, and Cosmetic Act (FDCA) expressly provides that "[n]othing in [the FDCA] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device," *see* 21 U.S.C. § 396, and that an action "for enforcement, or to restrain violations, of the [FDCA] shall be by and in the name of the United States," *see* 21 U.S.C. § 337(a) (ECF No. 88 at 17). Defendants take these provisions to mean that, because Plaintiff's claims are based on their alleged promotion of a medical device for off-label purposes (i.e., where the Unipolar Modular Head was intended for a hemi-arthroplasty, not a total hip arthroplasty like what Plaintiff received), they constitute an impermissible attempt to bring a private suit for violations of the FDCA (ECF No. 88 at 18–19).

12

In brief, the Court agrees with Plaintiff that she has not alleged that Defendants violated any federal statute, and that none of her state-law tort claims require direct interpretation or application of the FDCA or related federal regulations (ECF No. 95 at 18–19). *Cf. Cytosport, Inc. v. Nature's Best, Inc.*, No. Civ. S-06-cv-1799 DFL EFB, 2007 WL 1345379, at *2 (E.D. Cal. May 8, 2007) (denying motion to dismiss where plaintiffs could establish that a product's labelling was false or misleading "without relying on the FDCA or FDA regulations"); *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F.Supp. 918, 935 (C.D. Cal. 1996) (denying motion to dismiss where the question whether a misrepresentation was made could "be resolved without the interpretation or application of FDA regulations"); *Grove Fresh Distribs., Inc. v. Flavor Fresh Foods, Inc.*, 720 F.Supp. 714, 716 (N.D. Ill. 1989) (denying motion to dismiss where, "[a]lthough courts have held that there is no private cause of action under the FDCA, [plaintiff] has not brought suit directly under the FDCA or its accompanying regulations"). As such, Defendants' motion for summary judgment—to the extent that it argues that Plaintiff has brought a private enforcement action for violations of the FDCA's prohibition against "off-label" promotion of medical devices—is DENIED.

### c. There is a genuine factual dispute as to whether Defendants are the "apparent manufacturer" of the Unipolar Modular Head.

Defendants move for summary judgment on a third basis, arguing that Plaintiff's products liability claims cannot proceed because they are not the manufacturer of the Unipolar Modular Head, but are an "innocent seller" under C.R.S. § 13-21-402(1) (*see* ECF No. 88 at 19–20). Plaintiff counters that Defendants are "apparent manufacturers," thus removing them from the innocent seller statute's coverage (*see* ECF No. 95 at 19–20).

13

The innocent seller statute provides, in relevant part, that "[n]o product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product . . . ." C.R.S. § 13-21-402(1). In turn, a "product liability action" is defined as

> any action brought against a manufacturer or seller of a product, *regardless of the substantive legal theory or theories upon which the action is brought*, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

C.R.S. § 13-21-401(2) (emphasis added). Based on this statutory definition, Defendants correctly observe that if they qualify only as an "innocent seller" of the Unipolar Modular Head, and not as a "manufacturer," then Plaintiff's "product liability" claims for strict liability, negligence, and breach of warranties fail as a matter of law.[2]

Here, it is undisputed that former Defendant Corin is the *actual* manufacturer of the Unipolar Modular Head (*see* ECF No. 88, ¶ 3; ECF No. 95 at 3, ¶ 3). This does not end the inquiry,

---

[2] The parties' briefing suggests some disagreement about the scope of "product liability actions" and which claims are potentially barred if Defendants qualify as an "innocent seller." Defendants argue that "because HOC is not the manufacturer of the Unipolar Modular Head, Plaintiff's products liability claims for strict liability (Count I); negligence (Count II); and breach of warranties (Count III) fail as a matter of law" (ECF No. 88 at 20). In response, Plaintiff argues that "[t]he innocent seller provision only applies to strict liability claims, making clear Plaintiff's negligence claims, warranty claims, and CCPA claims are also excepted from any application of this statute under any all [*sic*] circumstances" (ECF No. 95 at 20). Ultimately, Plaintiff is mistaken on this point. By definition, product liability actions "are those tort actions which seek damages for injuries and collateral damage caused by defective products," *Carter v. Brighton Ford, Inc.*, 251 P.3d 1179, 1187 (Colo. App. 2010), without regard to "the substantive legal theory or theories upon which the action is brought," C.R.S. § 13-21-401(2). This definition would encompass Plaintiff's claims of strict liability, negligence, and breach of warranties to the extent that they are based upon defects in the product's design, manufacturing, warnings, or instructions rendering the product unreasonably dangerous. *Carter*, 251 P.3d at 1187. However, Defendants do not argue—and the Court does not find at this time—that Plaintiff's CCPA claim fails as a matter of law should the innocent seller statute apply.

however, because Defendants may nevertheless qualify as an *apparent* manufacturer precluding application of the innocent seller statute. Pertinent here, a seller may be a product's "apparent manufacturer" in one of two ways. First, the seller may hold itself out as the manufacturer—e.g., by placing a private label on the product without disclosing the identity of the actual manufacturer. *See Heinrich v. Master Craft Eng'g, Inc.*, 131 F.Supp.3d 1137, 1158 (D. Colo. 2015). Second, the seller may be deemed to be a manufacturer if it "has actual knowledge of a defect in a product." *See* C.R.S. § 13-21-401(1).

In view of this standard, Plaintiff raises a genuine issue of material fact as to whether Defendants qualify as the Unipolar Modular Head's apparent manufacturer. For instance, Plaintiff has adduced facts tending to show that Defendants (namely, Stryker) held themselves out as the manufacturer of the Unipolar Modular Head (ECF No. 95 at 19–20). Among other evidence, Plaintiff's implant medical record listed "Stryker" as the manufacturer of the Unipolar Modular Head (*see* ECF No. 95-3 at 4), and the invoice received for her implants was on Stryker letterhead and never listed "Corin" as the device's true manufacturer (*see* ECF No. 95-13 at 1). Similarly, Plaintiff has adduced facts tending to show "actual knowledge on Stryker's part of the danger of the unipolar head" (ECF No. 95 at 20). For example, one of Ms. Truman's expert conclusions is that Stryker knew or should have known of the defects in the Unipolar Modular Head:

> Stryker knew of the metal debris and ion biologic risks and patient harms associated with Cormet [metal-on-metal] bearings, including the Cormet Head. Missing, untimely (delayed) safety alerts and/or safety communications concerning adverse local tissue reactions and loosening likely contributed to the selection and use of the Cormet Head in a [metal-on-metal] articulation and to the subsequent patient injuries, including those suffered by Corinne Bennington.

(ECF No. 95-15, ¶ 11; *see* ECF No. 95-1, ¶ 15).

Based on the foregoing, a genuine factual dispute over whether Defendants qualify as an "apparent manufacturer" prevents the Court at this time from determining as a matter of law that Defendants are an innocent seller against whom Plaintiff's product liability claims may not proceed. Put differently, the jury must be allowed to consider whether Stryker "held itself out" as the Unipolar Modular Head's manufacturer, as well as whether Stryker had "actual knowledge" of defects in the Unipolar Modular Head such that Stryker may be deemed a manufacturer. Accordingly, Defendants' motion for summary judgment, to the extent that it is predicated on Defendants' purported status as an "innocent seller," is DENIED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED (ECF No. 88).

DATED this 22nd day of June 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge